STATE OF MICHIGAN
IN THE 21st CIRCUIT COURT FOR THE COUNTY OF ISABELLA

INSPIRED CONCEPTS, LLC,
A Michigan Limited Liability Company,

    Plaintiff,

v

BRENT STOCKEL, individually, THE CLARK
STAMPEDE, LLC, a Michigan Limited
Liability Company, and MENU CONCEPTS,
INC., a Michigan Corporation, LADCO, Inc., a
Michigan Corporation,

    Defendants.

Case No. 19-16069_____-CB
Hon. Eric R. Janes

_____/

Michael F. Matheson (P52997)
Matheson Law Firm
Attorneys for Plaintiff
200 Woodland Pass, Suite F
East Lansing, MI 48823
(517) 993-6699
michael@mathesonlawfirm.com

_____/

Except for a civil action pending in the U.S. Eastern District Court, Case No.
19-cv-10855, involving LADCO, Inc., there is no other pending or resolved
civil action arising out of the transaction or occurrence alleged in the complaint.

## COMPLAINT

Plaintiff, Inspired Concepts, LLC ("Inspired Concepts"), by and through its

attorneys, Matheson Law Firm, states as follows for its Complaint against Defendants,

Brent Stockel, The Clark Stampede, LLC, Menu Concepts, Inc. and LADCO, Inc.:

## PARTIES, JURISDICTION AND VENUE

1.      Inspired Concepts is a Michigan limited liability company, with its principal place of business in Mt. Pleasant, Isabella County, Michigan.

2.      Defendant, Menu Concepts, Inc. ("Menu Concepts") is a Michigan corporation with its principal place of business in Mt. Pleasant, Isabella County, Michigan.

3.      Defendant, LADCO, Inc. ("LADCO") is a Michigan corporation with its principal place of business in Mt. Pleasant, Isabella County, Michigan.

4.      Defendant, The Clark Stampede, LLC ("Defendant Clark") is a Michigan limited liability company, with its principal place of business and registered office in Isabella County, Michigan.

5.      Defendant, Brent Stockel ("Defendant Stockel") is an individual who conducts business in Isabella County, Michigan and resides in Bay County, Michigan.

6.      Venue is proper in this Court under MCL 600.1621 insofar as Defendants Menu Concepts, LADCO and Clark have a principal place of business and registered office in Isabella County, Michigan and Defendant Stockel regularly conducts business in Isabella County, Michigan.

7.      Jurisdiction is proper in this Court because the amount in controversy exceeds $25,000.00.

## GENERAL ALLEGATIONS

8.      On April 9, 2014, Inspired Concepts entered into a Purchase and Sale of Business Assets ("Purchase Agreement") with Menu Concepts, Inc. and affiliates of Menu Concepts. The Purchase Agreement is attached as Exhibit 1.

9.      The Purchase Agreement provided that Inspired Concepts would purchase, among other things, six different Ponderosa restaurants in Michigan (Cadillac, Mt.

2

Pleasant, Coldwater, West Branch, Gaylord, Owosso) from Menu Concepts and one in Indiana (Auburn) (collectively the "Ponderosa Restaurants").

10.　　Menu Concepts owned and operated the Ponderosa Restaurants while affiliates of Menu Concepts owned and operated the other restaurants included in the Purchase Agreement.

11.　　The Closing of the Purchase Agreement occurred on October 2, 2014.

12.　　In connection with the Closing of the Purchase Agreement, Inspired Concepts and LADCO entered into a Subfranchise Agreement for five of the Ponderosa Restaurants (Coldwater, Owosso, West Branch, Gaylord and Cadillac, collectively "LADCO Subfranchises"). The Subfranchise Agreement for the Gaylord location is attached as Exhibit 2. The Subfranchise Agreements for the other LADCO Subfranchises are the same or similar to the Gaylord Subfranchise Agreement and, as such, are not attached. The Subfranchise Agreements are all in the possession of LADCO.

13.　　A common interest of ownership and control exists between LADCO and the Sellers under the Purchase Agreement.

14.　　Section 15.3 of the Purchase Agreement states, among other things, that "Seller will not, during the one-year period following the date of Closing, directly or indirectly solicit any employee of the Buyer to leave Buyer's employment." ("Non-Solicitation Clause").

15.　　The Subfranchise Agreement at Sec. 7.A.(4), in relevant part, provides that the subfranchisee will not "employ or seek to employ any person who is employed by Subfranchisor, its Affiliates or by any other developer or Subfranchisee of PONDEROSA Restaurants, nor induce any such person to leave said employment without the prior written consent of such person's employer."

3

16.     Defendant Clark is also a Ponderosa subfranchisor of LADCO and, upon information and belief, is bound by the same non-solicitation clause as contained in the Subfranchise Agreements between LADCO and Inspired Concepts.

17.     Darren Clark is a former employee and division manager of Inspired Concepts who terminated his employment in May 2016.

18.     At the time of his departure Darren Clark was responsible for the Ponderosa Restaurants owned and operated by Inspired Concepts.

19.     Brent Stockel is a former employee and division manager of Inspired Concepts who terminated his employment on April 5, 2019.

20.     During his employment, Brent Stockel was responsible for the Ponderosa Restaurants owned and operated by Inspired Concepts.

21.     During and after his employment with Inspired Concepts, Darren Clark was subject to a non-compete restrictive covenant contained in an Employee Non-Compete Agreement ("Clark Non-Compete"). Exhibit 3.

22.     Upon information and belief, Menu Concepts and LADCO induced and encouraged Darren Clark, during the effectiveness of the Non-Solicitation Clause under the Purchase Agreement, to leave his employment with Inspired Concepts for the purpose of owning and operating the Clare, Michigan Ponderosa location.

23.     The discussions between LADCO and Darren Clark occurred in secret and were concealed from Inspired Concepts in an effort to avoid the disclosure of a violation of the Non-Solicitation Clause.

24.     As the Subfranchisor of the Clare Ponderosa, LADCO was actively soliciting candidates to assume ownership of the Clare Ponderosa in order to avoid any interruption in franchise and other fees under the subfranchise agreement.

4

25.     It was also unknown to Inspired Concepts that at the time Darren Clark terminated his employment with Inspired Concepts the Clare Ponderosa was being marketed for sale.

26.     In the year following his separation of employment from Inspired Concepts, Darren Clark repeatedly assured Inspired Concepts that he was not actively seeking to assume control of the Clare Ponderosa and that he was not employed by the Clare Ponderosa Subfranchisee or otherwise in breach of the Clark Non-Compete.

27.     These representations were false and concealed from Inspired Concepts by Defendants as Menu Concepts and LADCO actively solicited Darren Clark for the Clare Ponderosa and away from employment with Inspired Concepts.

28.     Defendants' actions were unknown to Inspired Concepts until recently.

29.     The solicitation of Darren Clark by Menu Concepts and LADCO harmed Inspired Concepts by causing a loss of managerial staff with knowledge and experience with the Ponderosa brand.  Darren Clark was the only trained multi-unit personnel for Ponderosa in the Inspired Concepts organization.

30.     The loss of critical staff familiar with the Ponderosa brand resulted in lost sales and profits and contributed to the decline in business operations and an inability to keep current on the Lease Agreements for the Ponderosa Restaurants with landlords having a common ownership and interest with Defendants, Menu Concepts and LADCO.

31.     Furthermore, after his acquisition of the Clare, Michigan Ponderosa, Defendant Clark, along with LADCO, solicited and hired Defendant Stockel from Inspired Concepts for a managerial position overseeing operations of Ponderosa restaurants operated by Defendant Clark.

32.     Defendant Stockel's employment with Defendant Clark was aided and encouraged by LADCO and its representatives, Brad Hansen and Bart LaBelle.

5

33. Defendant Stockel is subject to a non-compete restrictive covenant contained in an Employee Non-Compete Agreement ("Stockel Non-Compete"). Exhibit 4.

34. Defendant Stockel's employment with Defendant Clark is a breach of the Stockel Non-Compete.

35. Inspired Concepts provides its employees access to sensitive and propriety business information, like Inspired Concepts' know-how, trade secrets and confidential business information, including its customer lists, vendor lists and proprietary pricing ("Confidential Information").

36. Inspired Concepts has a legitimate competitive business interest in protecting its Confidential Information and avoiding the use of its information by others to the detriment of Inspired Concepts.

37. The Defendants' improper use of the Confidential Information will cause harm to Inspired Concepts in the loss of customers, profits and goodwill.

38. As a Subfranchisee to LADCO, Inspired Concepts is an intended third-party beneficiary to the Subfranchise Agreement between LADCO and Defendant Clark.

39. LADCO has actively engaged and, with knowledge, allowed Defendant Clark to breach the non-solicitation clause in its Subfranchisee agreement without enforcement by LADCO.

40. As a result of LADCO's solicitations of Inspired Concepts' employees for employment with another Subfranchisee, in violation of the Subfranchise Agreement, Inspired Concepts has been injured.

## COUNT I — INTENTIONAL INTERFERENCE
## WITH A BUSINESS RELATIONSHIP OR EXPECTANCY

41. Inspired Concepts re-alleges and incorporates by reference the allegations contained in all preceding and subsequent paragraphs as if fully set forth herein.

6

42.     Inspired Concepts had a valid business relationship and expectancy with Defendant Stockel and Darren Clark, from which it derived a future economic benefit.

43.     Inspired Concepts also has a valid business relationship and expectancy with its other employees, from which it derives an economic benefit.

44.     Defendant LADCO knew, or should have known, of Inspired Concepts' business relationships and expectancies with Darren Clark.

45.     Defendant Clark knew, or should have known, of Inspired Concepts' business relationships and expectancies with Defendant Stockel.

46.     Defendant LADCO induced Darren Clark to terminate his employment with Inspired Concepts.

47.     Defendant Clark induced Defendant Stockel to terminate his employment with Inspired Concepts.

48.     By inducing Darren Clark to terminate his employment relationship with Inspired Concepts and continuing to solicit others to terminate their employment relationship, Defendant LADCO intentionally and either improperly or without justification interfered with Inspired Concepts' business relationship and expectancies.

49.     By inducing Defendant Stockel to terminate his employment relationship with Inspired Concepts and continuing to solicit others to terminate their employment relationship, Defendant Clark intentionally and either improperly or without justification interfered with Inspired Concepts' business relationship and expectancies.

50.     The actions of Defendants LADCO and Clark to interfere with Inspired Concepts' business relationship and expectancies are *per se* wrongful and/or were and are done with malice and unjustified in law.

51.     Defendants LADCO and Clark's misconduct is the proximate damages to Inspired Concepts.

WHEREFORE, Inspired Concepts respectfully requests that this Court enter judgment in its favor and against Defendants LADCO and Clark, jointly and severally, in an amount in excess of $25,000.00, plus interest, costs, reasonable actual attorneys' fees and any other relief the Court deems equitable and just.

## COUNT II – BREACH OF CONTRACT
## (NON-SOLICITATION – PURCHASE AGREEMENT)

52. Inspired Concepts re-alleges and incorporates by reference the allegations contained in all preceding and subsequent paragraphs as if fully set forth herein.

53. The Purchase Agreement is a valid and enforceable contract.

54. At Section 15.3, the Purchase Agreement provides that Sellers "will not, during the one-year period following the date of Closing directory or indirectly solicit any employee of the Buyer to leave Buyer's employment."

55. Inspired Concepts has performed its obligations under the Purchase Agreement.

56. Defendant Menu Concepts, with the aid of and knowledge of LADCO, breached the Purchase Agreement by soliciting Darren Clark for employment at, and ownership of, the Clare Ponderosa.

57. As a direct and proximate result of Defendants' breaches of the Purchase Agreement, Inspired Concepts has suffered damages that were reasonably foreseeable, including loss of customers, substantial loss of business profits, harm to goodwill and failure of the benefit of the bargain under the Purchase Agreement.

WHEREFORE, Inspired Concepts respectfully requests that this Court enter judgment in its favor and against Defendants, in an amount in excess of $25,000.00, plus interest, costs, reasonable actual attorneys' fees and any other relief the Court deems equitable and just.

8

## COUNT III – BREACH OF CONTRACT
## (NON-SOLICITATION – SUBFRANCHISE AGREEMENT)

58.     Inspired Concepts re-alleges and incorporates by reference the allegations contained in all preceding and subsequent paragraphs as if fully set forth herein.

59.     The Subfranchise Agreements are valid and enforceable contracts.

60.     Inspired Concepts is a third-party beneficiary to the Subfranchise Agreement between LADCO and Defendant Clark as a "Subfranchisee of PONDEROSA Restaurants."

61.     Defendant Clark breached its Subfranchise Agreement when it solicited and hired Defendant Stockel away from Inspired Concepts.

62.     Defendant Clark's actions were taken with the active participation of LADCO.

63.     Based upon its active involvement in these wrongful actions, LADCO will not enforce the rights of the "Subfranchisee of PONDERSA Restaurants" under the Clare Ponderosa Subfranchise Agreement.

64.     The lack of enforcement by LADCO shows a willful indifference to the rights of Inspired Concepts as a "Subfranchisee of PONDERSA Restaurants."

65.     As a direct and proximate result of Defendants' breaches of the Subfranchise Agreements, Inspired Concepts has suffered damages that were reasonably foreseeable, including loss of customers, substantial loss of business profits and harm to goodwill.

WHEREFORE, Inspired Concepts respectfully requests that this Court enter judgment in its favor and against Defendants, in an amount in excess of $25,000.00, plus interest, costs, reasonable actual attorneys' fees and any other relief the Court deems equitable and just.

## COUNT IV — CIVIL CONSPIRACY

66.     Inspired Concepts re-alleges and incorporates by reference the allegations contained in all preceding and subsequent paragraphs as if fully set forth herein.

67.     Defendants illegally, maliciously and wrongfully conspired with one another, by a concert of action, to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means.

68.     The Defendants also acted tortiously, pursuant to a common design.

69.     Defendants, in combination with each other, conspired to interfere with the business relationships and expectancies, as well as the contractual rights, of Inspired Concepts under the Non-Compete Agreements with their employees, the Subfranchise Agreements and Purchase Agreement, and to conceal from Inspired Concepts Defendants' illegal, unlawful and tortious activities.

70.     As a result of the conspiracy and Defendants' illegal, wrongful or tortious acts, Defendants did interfere with Inspired Concepts' business relationships and expectancies and its contractual rights.

71.     The conspiracy and Defendants' illegal, wrongful or tortious acts are the proximate cause of damages to Inspired Concepts in the loss of customers, substantial loss of business profits and harm to its goodwill.

72.     Defendants are jointly and severally liable to Inspired Concepts for all its injuries and damages.

WHEREFORE, Inspired Concepts respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, in an amount in excess of $25,000.00, plus interest, costs, reasonable actual attorneys' fees and any other relief the Court deems equitable and just.

## COUNT V — DECLARATORY JUDGMENT
## (THIRD PARTY BENEFICIARY)

73.     Inspired Concepts re-alleges and incorporates by reference the allegations contained in all preceding and subsequent paragraphs as if fully set forth herein.

74.     Inspired Concepts entered into the Subfranchise Agreements with LADCO with the understanding that LADCO would enforce, among other terms, the reciprocal non-solicitation clause in the Subfranchise Agreements to avoid other subfranchisee's from poaching the employees of Inspired Concepts.

75.     As a Subfranchisee, Inspired Concepts is a third-party beneficiary to the rights of the "Subfranchisee of PONDEROSA Restaurants" under the reciprocal non-solicitation clause contained other subfranchise agreements.

76.     LADCO has not only ignored the reciprocal non-solicitation clause but also aided other subfranchisee's in violating the non-solicitation clause.

77.     There is a present case and controversy between Inspired Concepts and LADCO under the Subfranchise Agreements regarding the enforceability of its terms.

78.     Pursuant to MCR 2.605, Inspired Concepts seeks a declaratory judgment that the Subfranchise Agreements were first materially breached by LADCO and were terminated upon Defendants' violation of the non-solicitation clause.

WHEREFORE, Inspired Concepts respectfully requests that this Court enter a declaratory judgment against Defendant LADCO finding that the (1) non-solicitation clause in the Clare Ponderosa Subfranchise Agreement was breached, (2) LADCO refused to enforce the terms of the non-solicitation clause and actively aided in its breach, and (3) the Subfranchise Agreements between LADCO and Inspired Concepts were terminated upon such breach, and award Inspired Concepts its costs, reasonable actual attorneys' fees and any other relief the Court deems equitable and just.

11

## COUNT VI – BREACH OF CONTRACT
## (NON-COMPETE)

79.     Inspired Concepts re-alleges and incorporates by reference the allegations contained in all preceding and subsequent paragraphs as if fully set forth herein.

80.     The Stockel Non-Compete is a valid and enforceable contract that was knowingly and voluntarily entered into between Inspired Concepts and Defendant Stockel.

81.     The terms of the Stockel Non-Compete are reasonable in scope, duration and geographical limits and serve to protect a legitimate competitive business interest of Inspired Concepts.

82.     Defendant Stockel has breached the Stockel Non-Compete by opting to become employed by Defendant Clark, the operator of the Clare, Michigan and other Ponderosas.

83.     As a direct and proximate result of Defendant Stockel's breaches of the Non-Compete Agreement, Inspired Concepts has suffered damages that were reasonably foreseeable to Defendant Stockel, including loss of customers, interference with Inspired Concepts current Team Members, substantial loss of business profits and harm to goodwill.

WHEREFORE, Inspired Concepts respectfully requests that this Court enter judgment in its favor and against Defendant Stockel, in an amount in excess of $25,000.00, plus interest, costs, reasonable actual attorneys' fees and any other relief the Court deems equitable and just.

Respectfully submitted,

Dated: November 22, 2019

Michael F. Matheson (P52997)
Matheson Law Firm
200 Woodland Pass, Suite F
East Lansing, MI 48823
(517) 993-6699
Attorneys for Inspired Concepts

13

# Exhibit 1

# PURCHASE AND SALE OF BUSINESS ASSETS

This Agreement (the "Agreement") is made on effective on April 9, 2014 (the "Effective Date") between: The Pixie, Inc, a Michigan corporation; Quick Casual Corporation, a Michigan corporation; Fast Casual, LLC a Michigan limited liability company; Menu Concepts, Inc., a Michigan corporation; MI Smash, LLC a Michigan limited liability company; and LLJBT Construction, LLC, a Michigan limited liability company ("Sellers"), whose address is 405 S. Mission, Mt. Pleasant, MI 48858, and Inspired Concepts, LLC, a Michigan limited liability company ("Purchaser"), whose address is 1577 Sanborn, Dewitt, MI 48820 (collectively, the "Parties").

## Recitals and Agreements

This Agreement is made with reference to the following facts, circumstances and Agreements:

A. Sellers owns and operates certain restaurants and the assets used in connection with such businesses (the "Businesses") under the following names: The Pixie, Big Apple Bagels, Bennigans, Ponderosa, Italian Oven, and Smashburger (the "Name" or "Names"), at various locations throughout Michigan and Indiana (the "Location" or "Locations"). The list of restaurants, and Seller entity, from which Sellers are selling their assets is as follows:



    i. The Pixie, Inc./Sweet Onion Inc./Bellhoff Corporation:
        1. Midland Big Apple Bagels
        2. Mt. Pleasant Big Apple Bagels
        3. Italian Oven (w/MLCC license)
        4. Auburn Indiana Ponderosa
        5. Pixie Restaurant

    ii. Quick Casual Corporation:
        1. Midland Bennigans (w/MLCC license)
        2. Saginaw Bennigans (w/MLCC license)
        3. Mt. Pleasant Bennigans (w/MLCC license). This Liquor License is a Class B Hotel license which cannot be separated from the hotel. As such, Purchaser and Seller Quick Casual Corporation shall enter into a mutually agreeable Co-License Agreement, subject to the approval of the MLCC.

    iii. Menu Concepts, Inc.:
        1. Mt. Pleasant, Michigan Ponderosa
        2. Owosso, Michigan Ponderosa
        3. West Branch, Michigan Ponderosa
        4. Gaylord, Michigan Ponderosa
        5. Cadillac, Michigan Ponderosa
        6. Coldwater, Michigan Ponderosa

1

iv. MI Smash LLC:
   1. West Bloomfield, Michigan Smashburger
   2. Troy, Michigan Smashburger
   3. Three future Smashburger development sites

B. Sellers desire to sell and Purchaser desires to purchase Sellers's interest in the "Purchased Assets," as defined in this Agreement.

~~C. Sellers also owns the following restaurants that Purchaser will manage for Sellers under separate Management Agreements, attached as Exhibit 4, of even date with this Agreement.~~

   i. Quick Casual Corporation will enter into a Management agreement with Purchaser to manage the operations of the Kalamazoo, Michigan Bennigans. Buyer to manage year 1 for 1%, year 2 for 1.5%, and any succeeding years for 2%, all of which are based upon net sales.

   ii. Fast Casual, LLC will enter into a Management Agreement with Purchaser to manage the operations of the Howell, Michigan, Bennigans. Buyer to manage year 1 for 1%, year 2 for 1.5%, and any succeeding years for 2%, all of which are based upon net sales.

   iii. Menu Concepts, Inc. will enter into a Management Agreement with Purchaser to manage the operations of the Saginaw, Michigan Ponderosa. Buyer to manage this location for 1% of net sales, on-going.

   iv. LLJBT Construction, LLC will enter into a Management Agreement with Purchaser to manage the operations of the Gun Lake Casino Food Court restaurants being Johnny Rockets, Villa Pizza, Tim Horton's and Cold Stone Creamery. Buyer to manage years 1-3 for 1% of net sales, and 2% for each year thereafter.

~~Sellers are not selling any assets from the restaurants named in C.i. - C.iv., above, but are only entering into management agreements with Purchaser.~~

D. The Parties agree as follows:

Agreement

## 1. Agreement to Purchase and Sell.

1.1 <u>Assets Purchased and Sold</u>. Except as to restaurants that will only be managed by Purchaser according to the terms of the separate Management Agreements, at the Closing (as defined in this Agreement), Purchaser shall buy and Sellers shall sell, assign, convey, transfer, set over, and deliver (by appropriate instrument of transfer) to Purchaser all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on the Closing Date (as defined in this Agreement)

2



are owned by Sellers or in which Sellers has an interest of any kind. These include, without limitation, the following, (excluding, however, those assets specifically identified in this Agreement as the "Excluded Assets") (collectively, the "Purchased Assets"):

A. Trade Fixtures. Trade fixtures and equipment, as defined in the Michigan Uniform Commercial Code, MCL 440.1101–.11102 (the "UCC"), limited specifically to the assets described in Exhibit 1 (the "Trade Fixtures and Equipment");

B. Miscellaneous Items. All patents, logos, slogans, trademarks, copyrights, franchise rights, know-how, processes, trade secrets, formulae, inventions, telephone numbers, telephone listings, computer programs, software programs, software and technical libraries, engineering data, electronic data bases, all drawings, license agreements and all other intellectual and/or proprietary information and property and applications therefor or licenses thereof, used in connection with the Business, including Internet address[es] for the Business, if any (collectively, the "Miscellaneous Items");

C. MLCC Licenses. Michigan Liquor Licenses: Quick Casual: Class B Hotel Resort, Mt. Pleasant Bennigan's, 191353, to be under a Co-License agreement; Class C Resort, Saginaw Bennigan's, 187684; Class C, Midland Bennigan's, 187677; and, Class C Resort 40902 and SDM, Mt. Pleasant Italian Oven, 154245 together with all permits currently associated therewith (hereinafter collectively referred to as the "Liquor Licenses" – currently in use at the Italian Oven, the Midland Bennigans, the Saginaw Bennigans and the Mt. Pleasant Bennigans together with all of the alcoholic inventory owned by Seller in connection with the Business as of the date of Closing (the "Alcohol Inventory"). The Alcohol Inventory shall be conveyed to Purchaser by a Bill of Sale in mutually acceptable form. The alcoholic inventory will be taken on the day of closing. Purchaser shall pay to Sellers, in immediately available funds, the value of the alcohol inventory at closing. Sellers shall cooperate with Purchaser in obtaining all necessary approvals of the transfer of the Liquor Licenses and shall promptly execute those forms and take those actions which are reasonably required in order to affect the transfer of the Liquor Licenses to Purchaser. Attached as Exhibit 1.2 are copies of existing Licenses and the required MLCC forms and applications necessary to transfer the licenses.

D. Customer List and Miscellaneous Records. Any records, files, lists and other tangible assets that pertain to the Business, including lists and records pertaining to any one or more of the following: Sellers's customers, suppliers, advertising, promotional material, sales, services, delivery, and/or operations, except those items, if any, required to be retained by law, including accounting records and returns (collectively, the "Customer List and Miscellaneous Records");

E. Contracts. All contracts and service agreements (collectively, the "Contracts") shall be delivered by Sellers to Purchaser at the Closing;

3



F. <u>Sales, Contracts and Service Records</u>. All contracts and service records for sales, services, or leasing relating to the Business (collectively, the "Sales Contracts/Service Records") shall be delivered by Sellers to Purchaser at the Closing; and

G. <u>Goodwill</u>. The goodwill, telephone and fax numbers, yellow-page advertisements, and Sellers's right to use some form of the Names including the Business Internet addresses (collectively, the "Goodwill").

1.2 <u>Excluded Assets</u>. Except as otherwise set forth in this Agreement, this Agreement contemplates the purchase and sale, inclusive of assignments, of the Purchased Assets. This Agreement specifically excludes, however, the following assets (collectively, the "Excluded Assets"):

A. Sellers's cash, cash equivalents, and investments which are not relating to the operation of the Business;

B. Sellers's books of account, all accounts receivable, prepaid expenses, prepaid taxes, credit plan reserves, lease deposits assigned by Sellers shall be reimbursed by Purchaser at closing so long as Sellers provide written verification that landlord has transferred into the name of Purchaser, and deferred tax credits of Sellers;

C. The liabilities and debts of Purchaser to Sellers, including lease obligations prior to assignment of any lease, and all liens and encumbrances granted by Purchaser in favor of Sellers to secure any debts to Sellers pursuant to the payment terms described in this Agreement; and

D. The following miscellaneous items of personal property and possessions of Owner that are not and have not been a part of the operation of the Businesses: (1) Hansen Varsity jacket located at the Pixie.

Unless otherwise agreed in writing, Sellers, at Sellers's expense, shall remove the Excluded Assets from the Location as soon as possible after the Closing Date but in no event later than seven (7) days after the Closing Date. If Sellers fail to comply with the foregoing provisions, Purchaser may retain such items for purchasers own use or dispose of such items at Purchaser's expense or make such other arrangements as Purchaser may determine appropriate.

1.3 <u>Liabilities Assumed and Excluded</u>.

A. <u>Assumed Liabilities</u>. As of the Closing Date, Purchaser shall assume, pay, and perform in due course the liabilities of Sellers under the Contracts arising after the close of business on the Closing Date and those trade payables and other liabilities specifically identified on attached Exhibit 2 (the "Assumed Liabilities"). At the Closing, such Exhibit shall be updated and delivered by Sellers to Purchaser; and

4



Purchaser, at Purchaser's election, may assume any liabilities in excess of the specific dollar amount described in said Exhibit.

B. Excluded Liabilities. Except for the Assumed Liabilities, Purchaser does not assume nor shall Purchaser be obligated for any other liabilities or responsibilities whatsoever of Sellers or the Business as conducted by Sellers through the Closing Date, inclusive of obligations or liabilities resulting from Sellers's total or partial withdrawal from any pension, profit sharing, or retirement plans (the "Excluded Liabilities").

1.4 Leases. Sellers or entities under the common control of Sellers that are the actual owners of the real estate on which each restaurant, listed in Recitals Article A.i., above, is operated Agree to Lease to Purchaser, each parcel of real estate as evidenced by the Leases attached as Exhibit 3.

1.5 Management Agreements. As indicated at Recitals Article C., above, Sellers own certain restaurants that are not being sold to Purchaser, but for which certain Sellers and Purchaser shall enter into certain Management Agreements as evidenced by the attached Management Agreements at Exhibit 4.

1.6 Franchise Agreements. Sellers agree to assist Purchaser in securing any franchise rights from Franchisors. Sellers cannot guarantee Franchisors will accept and approve Sellers request, but Sellers will use their best efforts to have any franchise agreements assigned to Purchaser. In the event any franchisor fails to accept or approve a transfer of franchise rights to Purchaser, this Agreement may be terminated by Purchaser at its option, in which case the Deposit (as defined in Section 3.1 of this Agreement) shall be refunded to Purchaser.

1.7 Antlers. One of Sellers is engaged in the management of a Canadian Lakes restaurant known as Antlers. Sellers agree to assign said management contract to Purchaser under a Management Agreement that will be known as "the Antlers Agreement" attached as Exhibit 5. The Antlers Agreement shall provide for a year 1 management fee split of 75%/25% to Sellers/Purchaser; years 2-5 split 62.5%/37.5% to Sellers/Purchaser; year 6 and each year thereafter the management fee split 80%/20% to Purchaser/Sellers. Purchaser is entitled to 100% of any "profit split".

1.8 Office Lease. Sellers, or such entity under common control of Sellers owners, agree to lease to Purchaser approximately 1/3 of the LaBelle Management office headquarters located at 405 S. Mission, Mt. Pleasant, Michigan. Lease is attached as Exhibit 6.

1.9 LADCO. As a corollary to this Agreement, an entity under common control with Sellers, LADCO, Inc. agrees to grant to Purchaser an option, 5 years after the date of this Agreement, to purchase the rights from LADCO to the Ponderosa Master Franchise Agreement. The predetermined price at the 5 year option period shall be 5 times the then current annual fees collected by LADCO from franchised Ponderosas. If purchaser elects not to exercise the Option, it may have another Option after 7 years from the date of this Agreement where the predetermined Option price shall be 6 times the annual fees; Attached at Exhibit 7 is the Option Agreement.

5

## 2. Purchase Price.

2.1 <u>Purchase Price; Allocation of Assets</u>. The purchase price for the Purchased Assets, is $4,150,000, plus or minus Adjustments; based on the facts below (the "Purchase Price"). The Purchase Price is allocated in the manner $2,200,000 to equipment and fixtures and $1,950,000 to goodwill, licenses and franchises. Exact allocation will be adjusted at closing based on final sales price.

| Inspired Concepts Purchase price sheet | 10/25/2013 | |
|---|---|---|
| Base purchase from 10/30/11 | $3,304,714 | |
| W. Lansing add back/asset sold | $41,377 | |
| 2 Smashburger's | $650,000 | |
| 3 future Smash sites | $15,000 | |
| Debt assumption - remodels | $495,555 | |
| | | |
| Midland Bennigans Adjustment | -$198,193 | |
| Big Boy Adjustment | -158,453 | *QQn.* |
| BIG APPLE ADJUSTMENT | -300,000 | |
| Sub Total | $4,150,000 3,850,000 | *QQr* |
| | | |
| Inventory | $_____ | |
| Franchise transfer fees | $50,000 | |
| Company Vehicles | $_____ | |
| Misc. | $_____ | |

**Grand Total**          $4,200,000  3,900,000  *QQn.*

2.2 <u>Tax Purposes</u>. The Parties agree (a) to be bound by the above allocation of purchase price for all federal, state, and local income tax purposes and (b) to file Internal Revenue Service form 8594 (and other forms required by law) in accordance with the allocation.

## 3. Terms of Payment.

3.1 <u>Payment</u>. The Purchase Price, shall be paid as follows:

A. <u>Deposit</u>. Concurrent with the execution of this Agreement, Purchaser shall deposit the amount of $100,000 less $27,500 currently held by Sellers for the benefit of Purchaser, or $72,500.00, in immediately available funds with Mt. Pleasant Abstract



of Mt. Pleasant, Michigan as escrow agent ("Deposit"). The Deposit shall be refundable upon the failure of any of the following contingencies: i) approval of financing for the Purchase Price which shall be satisfied upon a final financing letter from Purchaser's lender and final approval from the Small Business Administration, ii) approval by franchisor for the transfer of all franchises being conveyed herein which shall be satisfied upon receipt franchisor's executed approval, and iii) approval for the transfer of the Mt. Pleasant Bennigans liquor license to Purchaser or terms for an equivalent license mutually agreed upon by the Parties. Upon satisfaction of the contingencies, the Deposit will become nonrefundable and applied against the Purchase Price only if the Closing is completed in accordance with the terms of this Agreement. Closing is targeted to occur on or about May 1, 2014. If, however, Closing does not occur by July 1, 2014, due to fault of Purchaser, this Agreement shall become null and void and Sellers shall be entitled to retain the Deposit as their sole and exclusive remedy. If closing does not occur due to fault of Seller, then Purchaser may accept delays and proceed with closing or elect to terminate the transaction and receive a full refund of the Deposit. In either event neither party shall have any further obligation to the other.

B. Unpaid Balance at Closing. The balance, plus or minus any adjustments as indicated by Article 5 below, shall be paid in immediately available funds to each selling entity according to the attached Exhibit 8.

## 4. Accounts Receivable.

4.1 Accounts Receivable. All accounts receivable for transactions occurring before the Closing Date shall remain the property of Sellers irrespective of any payment for it to Purchaser. If Purchaser receives payment for any accounts receivable existing as of the Closing Date, Purchaser shall forward payment directly to Sellers.

## 5. Adjustments.

At the Closing, the following shall be adjusted or apportioned and, to the extent practicable, all such proration's shall be computed and paid at the Closing, and to the extent not practicable, as soon as practicable after the Closing:

5.1 Inventory. As of close of business the day immediately preceding Closing, Sellers shall procure an inventory of all goods for sale which are used in the operation for each of Sellers' restaurants and customarily inventoried by Seller at each restaurant at the end of a fiscal period, which shall include all food supplies, alcoholic beverages, paper goods, cleaning supplies and any other consumable or normally purchased operating items on a weekly or monthly basis during the course of normal operations. Sellers shall provide Purchaser with a written valuation, based upon Sellers cost, of said inventory to be attached to this Agreement as Exhibit 9, and Purchaser shall have ten (10) days after date of closing to approve and pay, in immediately available funds, Sellers for said inventory.

7



5.2 Franchise Transfer Fees. Purchaser is responsible for the payment of all franchise fees. Sellers and Purchaser have estimated Franchise Transfer Fees to be $50,000 and have thus included $50,000 in the total purchase price to represent Franchise Transfer Fees. The Purchase Price will be adjusted upwards or downwards depending on the actual amount of Franchise Transfer Fees paid. In any event, Purchaser is to pay all Franchise Transfer Fees which are required by franchisor and provide proof of said payment to Sellers at Closing.

5.3 Debt for Remodels Adjustment. Seller has remodeled several of the units which Purchaser is purchasing and Purchaser acknowledges this fact. Seller is amortizing the cost of said remodeling projects over 5 years. The debt adjustment of Purchaser to be $495,555 for said remodels ("Remodeling Debt").

5.4 Taxes on Purchased Assets. Purchaser shall pay all taxes and assessments, extraordinary as well as ordinary, that may be levied on any Purchased Assets which become due after the Closing Date and which arise from actions of Purchaser after the Closing; provided that Sellers shall pay for all taxes upon Purchased Assets that arise from Sellers's ownership or operation of the Business on or before the Closing and which may be due on, before, or after the Closing Date. Current personal property taxes shall be prorated. Miscellaneous Business Taxes. All Social Security, sales, use, withholding, and single business taxes for all years up to and including the last completed tax year and all quarters for the current tax year immediately preceding the Closing Date shall be paid in full by Sellers, regardless of when payment of such amounts shall become due. Transfer Fees; Sales Taxes. Purchaser shall pay all transfer fees and applicable sales taxes, if any, (but excluding Sellers's income or other taxes in the nature thereof) arising under or on account of the purchase and sale of the Purchased Assets.

5.5 Miscellaneous. If applicable, adjustments shall be made for payroll and any other prepaid items, and any other unspecified unpaid taxes.

5.6 Balancing of Rebates. Sellers participate in certain rebate programs from various vendors. Seller is due certain rebates for the period preceding closing. Rebates are, however, paid from the vendors on several different schedules and as such, certain of these rebate payments will be made after closing. As to the restaurants Purchaser is actually purchasing, as rebate payments are received by Purchaser, those rebates shall be pro-rated and Sellers share paid over to Sellers. If Sellers receive any advance rebate payments, said advance payments shall also be prorated and Purchaser's share paid over to Purchaser. As indicated by this Agreement, Purchaser will only manage, and not purchase, certain restaurants for Sellers. Sellers will be entitled to Sellers share of rebates allocated to those restaurants on an on-going basis. No adjustments will be made at closing for these restaurants' rebates.

5.7 Balancing of Gift Cards. Sellers participate in and sell various Gift Cards from various Franchisors. Seller also sells proprietary Gift Certificates that are in the form of

8



checks redeemable on Sellers' checking account. Sellers are liable to pay over to Purchaser any amounts from Gift Cards or Gift Certificates redeemed by Purchaser that were sold by Seller prior to the closing. Seller will keep their Gift Card/Certificate accounts open for 24 months based on the run-off. All payments will run through the banks during their normal course of business. Purchaser agrees to have their own Gift Card/Certificate account open upon the day of closing to accommodate any Gift Cards/Certificates sold by Purchaser after closing.

5.8 <u>Timing of Adjustment</u>. Except as otherwise provided in this Agreement, the net amount of any of the adjustments set forth in this Agreement shall be either an increase or a decrease of the payments to be made at the Closing to the extent practicable. The amount of the adjustment shall be determined by Sellers Certified Public Accountant and mutually agreed upon by Sellers and Purchaser.

5.9 <u>Manager Bonus Accrual.</u> The Parties acknowledge that Sellers have adopted a manager bonus program, the accrual of which Sellers have funded in its ordinary course of business. Purchaser is implementing the same manager bonus program, at least through Sellers normal fiscal year end. Sellers and Purchaser agree to prorate the Payouts made under the Restaurant Manager Bonus Program during the current fiscal year, as those Payouts are calculated under the Restaurant Manager Bonus Program, so that Sellers are responsible for their pro rata share of the bonuses calculated from the beginning of the fiscal year up to the Closing Date. Purchaser is responsible for its pro rata share of bonuses calculated from the Closing Date to the end of each fiscal period. In any event Sellers bonus payout obligation shall cease for any time period after Closing. Sellers are not contributing toward the fiscal year-end bonus payouts.

6. **Title.**

At the Closing, title to the Purchased Assets shall be free, clear, and unencumbered, as specifically set forth in this Agreement.

A. <u>Lien Search</u>. Purchaser, at Purchaser's expense, may seek a tax lien search and financing statement search, both certified to a date later than the Effective Date.

B. <u>Application for Conditional Tax Clearance</u>. Immediately after the Closing, Sellers, through their Certified Public Accountant, shall make application for issuance of a conditional tax clearance(s) to the Michigan Department of Treasury pertaining to sales, use, single business, income, payroll withholding, and unemployment taxes for each Seller entity. Sellers shall assume the responsibility for the preparation of all appropriate returns and reports for submission of application for issuance of conditional tax clearance.

C. <u>Objection</u>. If objection to title is made based on a written opinion of Purchaser's attorney that the title is not in the condition required for performance under this Agreement, Sellers shall have ten (10) days from the date Sellers are notified in

9



writing of the particular defects claimed to either (1) remedy the title, or make arrangements to remedy title at the Closing; or (2) on written demand made by Purchaser, to refund any deposit in full termination of this Agreement if Sellers are unable to remedy title. Purchaser may elect to complete the purchase and sale and reserve any right to recover any damages arising out of the defect in title.

### 7. Creditors of Sellers.

7.1 <u>Agreement of Payment</u>. In addition to the warranties and representations contained in this Agreement, if for any reason any creditor or third party who is owed a debt by Sellers on or before the Closing, or who otherwise possesses any type of right or interest in the Purchased Assets arising from the ownership or operation of the Business, including the Purchased Assets, by Sellers prior to the Closing, holds or obtains a lien on the Purchased Assets, then the following shall apply:

A. Sellers, on written notice given by Purchaser to Sellers, shall pay such monies arising from the ownership or operation of the Business, including the Purchased Assets, by Sellers prior to the Closing required to obtain the release of any lien on the property within 2 months of such notice or before the seizure of the property, whichever occurs earlier;

B. In the event of default by Sellers as to the foregoing, Purchaser, on written notice given by Purchaser or Sellers, shall have the right to pay for the same and/or obtain the release of lien, if any, and receive a credit toward the payment of any obligations owing by Purchaser to Sellers until the indebtedness is paid in full or satisfied; and

C. If the indebtedness is paid in full or satisfied by Purchaser, then Sellers shall immediately reimburse Purchaser for any payment made by Purchaser.

### 8. Representations, Covenants, and Warranties of Sellers.

Sellers represent, covenant, and warrant the following to be true, which representations, covenants, and warranties shall survive the Closing:

8.1 <u>Status of Sellers</u>. Sellers are Michigan corporations and Michigan limited liability companies duly organized, validly existing, and in good standing under the laws of the State of Michigan; and, further, are properly authorized, according to Articles of Incorporation, Bylaws, Articles of Organization, Operating Agreements and duly adopted Resolutions, to enter into and carry out the transactions contemplated by this Agreement.

8.2 <u>Authority</u>. When executed, this Agreement and all instruments necessary to carry out the transactions contemplated by this Agreement (the "Related Documents") will be legal, valid, and binding obligations of each party signing such instruments on behalf of Sellers.



10

8.3 Financial Statements. Upon Purchaser's written notice, Sellers shall provide Purchaser with financial statements concerning the Businesses as of the fiscal year preceding the Effective Date, ( the "Financial Statements"). Purchaser's managing member currently serves as Chief Operating Officer of Labelle Management and agrees he is familiar with the Financial Statements of all Sellers.

8.4 Absence of Undisclosed Liabilities. Notwithstanding anything contained in this Agreement to the contrary, as of the dates of and except to the extent reserved or reflected in the Financial Statements, Sellers had no known liabilities or obligations. Sellers represent that Sellers does not know or have reasonable grounds to know of any basis for the assertion against Sellers, as of such dates, of any liability of any nature or in any amount not fully reserved or reflected in the Financial Statements.

8.5 Title to Properties. Sellers have good and marketable title to all its assets, including those reflected in the Financial Statements (except those since sold or otherwise disposed of in the ordinary course of business), subject to no mortgage, pledge, lien, encumbrance, security interest, or charge, except for the following: the Remodeling Debt.

8.6 Sellers's Name. Sellers agrees that from and after the Closing Date, Purchaser shall have the right to use in or in connection with the conduct of any business (whether carried on by Purchaser directly or through any affiliate) (1) the Name of the purchased business; or (2) any part or portion of the Name, either alone or in combination with one or more other words. Sellers warrant to Purchaser that it has taken all necessary action to protect the Name in the State of Michigan and agrees to take or cause to be taken any and all steps or actions that shall be or become permissible, proper, or convenient to enable or permit Purchaser to use the Name, or any portion of the Name, either alone or in combination with one or more other words, except as presently restricted. It is contemplated that on or as soon as practicable after the Closing Date, Sellers will terminate Sellers's interest in the Name(s) of the operating businesses. After the Closing Date, Sellers agree that they will not use the Name directly or indirectly, either alone or in combination with one or more other words, in or in connection with any business, activities, or operations that Sellers directly or indirectly may carry on or conduct. Purchaser further agrees, that within 90 days of the Closing, all printed material, including but not limited to; collateral, forms, letterhead, comment cards, signage etc. will be changed so that none of the above printed material indicates the name "LaBelle Management" or the word "LaBelle" in any form whatsoever. Purchaser is not purchasing any rights to use the name "Labelle Management" or "LaBelle" in any form.

8.7 Status of Contracts. Sellers have, to the best of Sellers's knowledge, complied with all of the provisions of contracts described in this Agreement and of all other contracts and commitments to which Sellers is a party. Further, other than those contracts or agreements specifically described in this paragraph, Sellers have no contract or commitment extending beyond the Closing Date, except: those identified in Exhibit 2.



11

8.8 Insurance. All assets owned by Sellers are and will be adequately insured against fire and casualty to the Closing Date; and, in addition, the leased premises occupied by Sellers are and will be adequately insured for fire and extended coverage, personal liability, and property damage (collectively, the "Policies"). Further, the Policies are and will be outstanding and duly enforced and the premiums to become due on the Policies to the Closing Date will be paid when due. Seller has not received any notice of any cancellation of the Policies.

8.9 Taxes; Unemployment Liabilities; Tax Returns and Audits.

A. Taxes. All personal property taxes and other taxes of any nature assessed against Sellers and/or the Purchased Assets are and will be fully paid by Sellers when due through the Closing Date. Without limiting the generality of the foregoing, all federal, state, county, and local taxes, including without limitation, income, corporate franchise, single business, stamp, transfer, sales and use, employee withholding, and *ad valorem* taxes due and payable by Sellers on or before the Closing Date have been or will have been paid or provided for by Sellers, including any unemployment tax liability and any deficit balance in Sellers's Michigan Unemployment Insurance Agency ("MUIA") account.

B. Tax Returns; Audits. Sellers have, and as of the Closing Date will have, filed all taxes and reports required to be filed by Sellers pursuant to the operation of the Business with all such taxing authorities, including MUIA. Seller does not have any outstanding or unsatisfied deficiency assessments with respect to any taxes, and there are no current audits or investigations by or disputes with any authority with respect to any taxes.

C. No Dispute. Seller is not involved in any dispute with any tax authority about the amount of taxes due, nor has it received any notice of any deficiency, audit, or other indication of deficiency from any tax authority not disclosed to the Parties to this Agreement.

8.10 Licenses and Permits. Sellers presently possesses and will continue to possess at the Closing Date all governmental licenses, permits, certificates of inspection, other authorizations, filings, and registrations which are necessary for Sellers to own and operate the Business as presently conducted. Certain Permit and license fees may become due and payable before closing is to occur. In such an event, Purchaser and Seller agree to prorate said fees based on the period of usage for such permits and licenses. Each party shall be liable for their share before or after closing, prorated in the closing statement.

8.11 Litigation or Insolvency Proceedings.

A. Litigation. There are no actions, suits, claims, investigations, or legal, administrative, or arbitration proceedings pending or, to the best of Sellers's and Owner's knowledge, threatened or likely to be asserted by or against Sellers or

12



relating to the Purchased Assets, this Agreement and/or the transactions contemplated hereby, before any court, governmental agency, or other body, including any quasi-judicial or administrative forum, and no judgment, order, writ, injunction, decree, or other similar command of any court, governmental agency, or body has been entered against or served upon Sellers or upon any individual Owner, except: **None.**
B. Insolvency Proceedings. Sellers is not involved in any proceeding by or against it in any court under the Bankruptcy Code or any other insolvency or debtor's relief act, whether state or federal, or for the appointment of a trustee, receiver, liquidator, assignee, or other similar official of Sellers or Sellers's property.

8.12 Labor Relations—Employees.

A. Collective Bargaining Agreements. There are no collective bargaining agreements currently in effect between Sellers and labor unions or organizations representing any of Sellers's employees; and there does not now exist and there has been no formal or informal request to Sellers for collective bargaining or for an employee election from any union or from the National Labor Relations Board (NLRB).

B. Termination of Employees. Except as provided in section 5.9, as of the Closing Date, Sellers will terminate all employees and will pay to all employees all wages, salaries, commissions, bonuses, benefit plan contributions, and other compensation. Purchaser may, in its discretion, reemploy some or all of such employees on the day after the Closing Date. After this Agreement is executed, Sellers and Purchaser shall jointly announce the Agreement to Sellers's employees, and shall cooperate so that Sellers's notices of termination and any offers of employment by Purchaser are delivered simultaneously so that appropriate management representatives may explain the termination and any offers of employment to the employees. Sellers represent and warrant that there are no employment contracts with any of Sellers employees and that all of their employees are at-will.

C. Employment Regulations Compliance. Sellers is in compliance with all applicable federal, state, and local laws and regulations respecting employment and employment practices, terms, and conditions of employment and wages and hours; and further, (1) there are no unfair labor practice complaints against Sellers pending before the NLRB, and no such complaints have been threatened; (2) there is no labor strike, dispute slowdown, or stoppage actually in progress or threatened against Sellers; (3) no grievance or arbitration proceedings are pending and no such claim has been asserted; and (4) Purchaser shall not incur any liability or obligation of any kind arising out of Sellers's employment of or termination of Sellers's employees nor for any other claim by any of Sellers's employees arising out of any employment relationship with Sellers.

D. Exclusion of Employee Benefits. Sellers acknowledge: Purchaser shall not assume, honor or be obligated to perform, and Sellers shall remain solely responsible for, any qualified or non qualified employee benefits of Sellers, unless such employee

13



benefits are specifically assumed as Assumed Liabilities; Seller will pay to Purchaser all accrued amounts for vacation up and until the date of Closing for eligible hourly and management employee paid vacation time, with any paid qualifying vacation time accruing during the current fiscal year to be prorated from the start of the fiscal year to the Closing Date.

E. Deferred Compensation Plan. Sellers have certain key employees covered under a separate Deferred Compensation Plan. That "Plan" will survive this agreement and Sellers will not be required to pay out or eliminate that Plan based on this agreement. Purchaser will assume no liability in that Plan and it will not affect Purchaser in any way.

8.13 Environmental Matters. To the best of Sellers's knowledge, there is no Hazardous Material in, on, or under the Location. In addition, there are no presently pending or threatened administrative or enforcement actions, investigations, compliance orders, claims, demands, actions, or litigation based on environmental laws or regulations or otherwise related to the presence of Hazardous Material, in, on, or under the Location. Seller makes no other environmental representations or warranties, but Sellers acknowledges that neither Party is required to close the transactions contemplated by this Agreement unless satisfied with the environmental reports or assessments conducted in accordance with this Agreement. For purposes of this paragraph, the term "Hazardous Material" shall mean any toxic or hazardous waste or substance (including without limitation asbestos and petroleum products) which is regulated by applicable local, state, or federal environmental laws or regulations.

8.14 Conduct of Business. From the date of the most recent Financial Statements delivered by Sellers to Purchaser to the Effective Date, the Business of Sellers have been (and until the Closing Date shall be) open and conducted by Sellers in a normal and regular manner; and further, Sellers have not:

A. Amended its Articles of Incorporation or Organization or Bylaws or Operating Agreements;

B. Issued or declared any dividend or other distribution or payment with respect to Sellers's corporate shares / issued or declared any distribution or payment with respect to Sellers's membership interests;

C. Entered into any contract or commitment extending beyond the Closing, except normal commitments made in the ordinary course of business;

D. Modified the compensation or benefits payable to or to become payable by Sellers to any officer, employee, or agent;

E. Encumbered any Purchased Assets;



14

F. Experienced any adverse change or any material damage, destruction, or loss affecting its assets or the Business; and/or

G. Entered into any agreement not in the ordinary course of business or agreed to do any of the foregoing.

8.15 Condition of Purchased Assets. The following representations are made with respect to the Purchased Assets:

A. The Purchased Assets are presently operating and have been regularly maintained and will be in the same working condition as of the Closing Date.

B. There are no known defects that have not been disclosed to Purchaser.

C. To the best of their knowledge, the Purchased Assets are in compliance with all applicable laws, ordinances, orders, codes, rules, regulations, building and use restrictions, and other legal requirements.

D. There are no known outstanding citations issued by any health, building, or other governmental agency, under the Occupational Safety and Health Act and/or under the Americans with Disabilities Act having jurisdiction over the operation of the Purchased Assets and/or the Business, including any claims of any violation of any federal, state, or local environmental statutes, regulations, ordinances, or other environmental regulatory requirements, except: **None.**

8.16 No Violation or Breach. The performance of this Agreement will not be in violation of any laws, statutes, local ordinances, state or federal regulations, court or administrative order, or ruling, nor is the performance of this Agreement in violation of the conditions or restrictions in effect for financing pursuant to any loan documents, whether any such loan is secured or unsecured.

8.17 ERISA Plans. Sellers have a 401(k) retirement plan for managerial employees which are subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

8.18 Full Disclosure. This Agreement and any other information furnished to the Purchaser in connection with the transactions contemplated by this Agreement neither contain any untrue statement of material fact nor omit to state any material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

8.19 Broker's or Finder's Fees. No agent, broker, investment banker, person, or firm acting on behalf of Sellers is or will be entitled to any broker's or finder's fees or any other commission or similar fee directly or indirectly from either of the Parties in connection with the sale of the assets contemplated hereby, except: **None.**

15



8.20 Patents, Trademarks, etc., of Sellers. Sellers have no patents, patent applications, trademarks, trade names, copyrights, and/or licenses presently owned or held by the Sellers, except the following: **None.**

8.21 Assumed Name of Sellers. The Names as indicated in this Agreement, above.

8.22 No Violation or Breach. The performance of this Agreement will not be in violation of any laws, statutes, local ordinances, state or federal regulations, court or administrative order, or ruling, not is the performance of this Agreement in violation of any loan document's conditions or restrictions in effect for financing, whether secured or unsecured.

8.23 Liquor Licenses. Sellers represent and warrant that the Liquor Licenses are in good standing; that Sellers have not received notice of any violations under the Liquor Licenses and have no actual knowledge of any such violations; and that there are now no revocation or suspension proceedings pending against the Liquor Licenses. Sellers further represent and warrant that Sellers will use reasonable efforts to avoid any acts which will be a ground for revocation or suspension of the Liquor Licenses prior to the Closing Date. Sellers are not aware of any impediments to the granting of an approval for the transfer of the Liquor Licenses to Purchaser.

8.24 Reliance. The foregoing representations and warranties are made by the Sellers with the knowledge and expectation that Purchaser is placing complete reliance on them.

**9. Representations, Covenants, and Warranties of Purchaser.**

Purchaser represents, covenants, and warrants the following to be true, which representations, covenants and warranties shall survive the Closing:

9.1 Status of Purchaser. Purchaser is a Michigan limited liability company duly organized, validly existing, and in good standing under the laws of the State of Michigan; and, further, is properly authorized, according to its Articles of Organization, and duly adopted Resolution, to enter into and carry out the transactions contemplated by this Agreement.

9.2 Authority. This Agreement and all Related Documents when executed will be legal, valid, and binding obligations of each party signing such instruments on behalf of Purchaser.

9.3 Awareness of Purchaser. Purchaser acknowledges the following:

A. Purchaser has, either individually or through agents or employees of Purchaser, sufficient knowledge, expertise, and financial capacity to operate the Business; and,



16

further, Purchaser is capable of evaluating the merits and risks of the purchase of the Business.

9.4 <u>Litigation</u>. There are no actions, suits, or proceedings pending or, to Purchaser's knowledge, threatened or likely to be asserted, against the Purchaser, before any court, administrative agency, or other body; and no judgment, order, writ, injunction, decree, or other similar command of any court or governmental agency has been entered against or served upon Purchaser relating to this Agreement and/or the transactions contemplated by this Agreement.

9.5 <u>Broker's or Finder's Fees</u>. No agent, broker, investment banker, person, or firm acting on behalf of Purchaser is or will be entitled to any broker's or finder's fees or any other commission or similar fee directly or indirectly from either of the Parties in connection with the sale of the assets contemplated by this Agreement, except: **None**.

## 10. Pre-Closing Actions and Miscellaneous Covenants.

From the Effective Date until the Closing:

10.1 <u>Purchaser's Access</u>. Purchaser's managing member currently serves as Chief Operating Officer of LaBelle Management and therefore has begun, but not yet completed its due diligence into the Purchased Assets (the Due Diligence Review).

10.2 <u>Due Diligence Review by Purchaser</u>. Purchaser has conducted over 2 years' worth of Due Diligence. Purchaser has had access to all financial information and has been in charge of the day to day operations and financial performance of the units Purchaser is purchasing. If Purchaser requires any additional information from Seller, Seller will provide information in a timely manner. Sellers' duty to provide information to Purchaser shall continue through the Closing

10.3 <u>Accuracy of Representations and Warranties; Satisfaction of Conditions</u>. Sellers will immediately advise Purchaser in writing if (1) any of Sellers's representations or warranties are untrue or incorrect in any material respect or (2) Sellers become aware of the occurrence of any event or any state of facts that results in any of the representations and warranties of Sellers being untrue or incorrect as if Sellers were then making them. Sellers will not take any action, or omit to take any action, that would result in any of Sellers's representations and warranties set forth in this Agreement to be untrue or incorrect as of the Closing Date. Sellers will use best efforts to cause all conditions within Sellers's control that are set forth in this Agreement to be satisfied as promptly as practicable under the circumstances.

10.4 <u>Conduct of Business</u>. Except as otherwise specifically provided in this Agreement, Sellers will use all reasonable efforts to keep the Business organization intact; to preserve the relationships with Sellers's customers, suppliers, and others having business dealings



17

with Sellers; and to preserve the services of Sellers's employees, agents, and representatives, if any. Without limitation of the foregoing:

A. Sellers shall not undertake any action without the prior written consent of Purchaser that, if taken before the date of this Agreement, would have been required to be disclosed on any Exhibit or required to be disclosed pursuant to the provisions of this Agreement; and

B. Sellers will not undertake any action which would alter the nature of the Business or result in any change in the Purchased Assets, other than in the ordinary course of business consistent with past practices.

### 11. Conditions Precedent to Obligations of Purchaser at Closing.

The obligations of Purchaser to perform this Agreement at the Closing are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Purchaser:

11.1 Accuracy of Representations and Warranties. The representations and warranties of Sellers contained in this Agreement and all Related Documents shall be true and correct at and as of the Closing Date as though such representations and warranties were made on the Closing Date. Further, upon request of Purchaser, Sellers shall deliver to Purchaser a certificate certifying that as of the Closing Date all of the representations and warranties of Sellers contained in this Agreement are true and correct.

11.2 Performance of Covenants. Unless otherwise agreed or waived, Sellers shall have in all respects performed and complied with all covenants, agreements, and conditions that this Agreement and all Related Documents require to be performed or complied with before or on the Closing Date. In addition, Sellers and Owner shall have properly executed and delivered the Noncompetition Agreement.

11.3 Lien Search. If objection to title is made by Purchaser based upon a written opinion of Purchaser's attorney that title is not in the condition as required for performance hereunder, Sellers shall have ten (10) days from the date Sellers is notified in writing of the particular defects claimed either (1) to remedy title, or make arrangements to remedy title at the Closing; or (2) if Sellers are unable to cure the defect, Purchasers may elect to complete the purchase and sale or upon written demand made by Purchaser, to refund any Deposit in full termination of this Agreement.

11.4 Closing Documents; Instruments of Transfer, Etc. Purchaser shall have received and approved the following:

A. All bills of sale, general instruments of transfer, conveyances, assurances, transfers, assignments, approvals, consents by third parties, and any other instruments and documents containing the usual and customary covenants and warranties of title



18

that are consistent with the requirements and the warranties of Sellers in this Agreement and that shall be convenient, necessary, or reasonably required to effectively transfer the Purchased Assets to Purchaser with good title, free and clear of all encumbrances.

B. All the Exhibits indicated in this Agreement.

11.5 <u>Certificate Regarding Tax Returns by State of Michigan</u>. Sellers shall have applied for a certificate from the Revenue Commissioner of the State of Michigan showing that Sellers has filed all tax returns and reports required to be filed before Closing and that it has paid all taxes due pursuant to Section 27a of the Michigan Revenue Act, MCL 205.27a.

11.6 <u>MUIA Form 1027</u>. Purchaser shall have received from Sellers in the time and manner required by law MUIA Form 1027. Purchaser shall have two (2) days following receipt by Purchaser of MUIA form to agree to be bound by terms of this Agreement irrespective of any other rights of review granted to Purchaser under this Agreement.

11.7 <u>No Litigation</u>. No action, suit, or other proceeding shall be pending or threatened before any court, governmental authority, or other lawful body seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in connection with this Agreement, or involving a claim that consummation of this Agreement shall be in violation of any law, decree, or regulation. No other material adverse actions or proceedings shall have been instituted or threatened against Sellers or the Business.

11.8 <u>No Material Adverse Change</u>. Except as described in this Agreement, there shall have been no material adverse change or development in the Business, its properties, results of operations, financial condition, assets, or volume of sales or service orders; and no fact or condition shall exist or be contemplated or threatened which will, or in Purchaser's reasonable judgment will be likely to, cause such a change or development.

11.9 <u>Fire or Other Casualty/Risk of Loss</u>.

A. <u>Assumption of Risk—Sellers</u>. Except as set forth in this Agreement, Sellers assumes all risks of destruction, loss, or damage due to any casualty, including any liability arising out of ownership of the Purchased Assets, up to the time of the Closing.

B. <u>Assumption of Risk—Purchaser</u>. Notwithstanding the foregoing, Purchaser assumes all risks of destruction, loss, or damage due to any casualty caused by Purchaser's negligence and in such event Purchaser assumes all risks of destruction, loss, or damage pertaining to any of the Purchased Assets placed in the possession of Purchaser and accepted by Purchaser in writing, prior to the Closing except defects in

19



the Purchased Assets, ordinary wear and tear, and a malfunction which results from Purchaser's ordinary use of the Purchased Assets to assist Sellers in the Business prior to Closing.

C. Insurance. In the event of casualty or malfunction of any of the Purchased Assets prior to Closing, Sellers's insurance shall be applied toward repair or replacement of any such property. Any liability of Purchaser shall be limited to damages in excess of any insurance proceeds received by Sellers or Purchaser and applied toward repair or replacement of the property. Sellers shall expeditiously file a claim with its insurance carrier upon notice of any such casualty or malfunction covered by insurance.

D. Damage to Sellers's Property. If any of the Purchased Assets is materially damaged at any time before the Closing, and the damages cannot reasonably be repaired on payment of the sums available by insurance settlement or from any sums to be paid by Purchaser to Sellers and Sellers refuse to repair or replace prior to or at the Closing, Purchaser, at Purchaser's option, shall have the right to terminate this Agreement and, upon giving notice of such election, Purchaser shall immediately receive a refund of any deposit in full termination of Purchaser's rights under this Agreement.

11.10 Liquor Licenses. The applications for transfer of the Liquor Licenses to Purchaser having been filed with the Michigan Liquor Control Commission and the Participation Management Agreement approved by the Michigan Liquor Control Commission.

11.11 Franchise Rights. All of the franchisors for the restaurants being acquired by Purchaser shall have agreed in writing to the transfer of all franchise rights to Purchaser.

11.12 Financing. The obligations of Purchaser under this Agreement are expressly contingent upon the Purchaser's receipt of a binding commitment from its lender and final approval from the Small Business Administration. Purchaser agrees to diligently pursue, and is in the process of seeking approval for, such financing.

11.13 Possession. Purchaser shall have received operating control and possession of all of the Purchased Assets at Closing.

11.14 Due Diligence Review. Purchaser shall have completed its Due Diligence Review by April 15, 2014.

## 12. Conditions Precedent to Obligations of Sellers at Closing.

The obligations of Sellers to perform this Agreement at the Closing are subject to satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Sellers:



20

12.1 <u>Representations and Warranties</u>. The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date.

12.2 <u>Performance of Obligations of Purchaser</u>. Purchaser shall have performed all obligations required to be performed by it under this Agreement prior to the Closing.

12.3 <u>Closing Documentation</u>. Sellers shall have received the following payment and documents:

A. The Deposit at the time it is received.

B. Full payment, plus or minus adjustments.

C. All other instruments and documents reasonably required by this Agreement to be delivered by Purchaser to Sellers, and such other instruments and documents as Sellers shall reasonably request which are not inconsistent with the provisions of this Agreement.

### 13. **Confidentiality**.

Purchaser acknowledges that, pursuant to the right to inspect Sellers's books, records, and other documents and materials, Purchaser has and will, as Chief Operating Officer of LaBelle Management become privy to confidential information of Sellers, and that communication of such confidential information to third parties (whether or not such communicated information is authorized by Purchaser) could injure Sellers's business in the event that this transaction is not completed. Purchaser agrees to take reasonable steps to ensure that such information about Sellers, obtained by Purchaser, shall remain confidential and shall not be disclosed or revealed to outside sources, and further agrees not to solicit any customers of Sellers disclosed from such confidential information. As used in this Agreement, "confidential information" includes information ordinarily known only to Sellers's personnel, and information such as customer lists, supplier lists, trade secrets, channels of distribution, pricing policy and records, inventory records, and other information normally understood to be confidential or designated as such by Sellers. Seller and its officers, directors, employees, successors, agents, members, managers, representatives, attorneys, successors, and assigns agree to keep the "confidential information", strictly confidential and will not, without written consent from Purchaser, disclose any confidential information to others, except that this provision shall not preclude Seller from disclosing confidential information to its attorneys, accountants or insurers in the ordinary course of business.

14. **Notices.** All notices, requests, demands or other communications hereunder shall be in writing and deemed given (a) when delivered personally or (b) on the day said communication is deposited in the U.S. mail, by registered or certified mail, return receipt requested, postage prepaid, or (c) on the next business day after notice is sent by email, or

21



(d) on the day said communication is deposited with a nationally recognized overnight courier service, addressed, as follows:

|                              |                                   |
|------------------------------|-----------------------------------|
| If to Sellers:               | If to Purchaser:                  |
|                              |                                   |
| Brad Hansen                  | Inspired Concepts c/o Jeffrey Neely |
| 405 S. Mission               | 1577 Sanborn                      |
| Mt. Pleasant, MI 48858       | Dewitt, MI 48820                  |
| bhansen@labellemgt.com       | jneely@labellemgt.com,            |
|                              |                                   |
| With a Copy To:              |                                   |
|                              |                                   |
| Todd Gambrell                | Michael Matheson                  |
| Lambert Leser                | Loomis Law Firm                   |
| 240 W. Main Street, Suite 1000 | 124 W. Allegan, Suite 700       |
| Midland, MI 48640            | Lansing, MI 48933                 |
| tgambrell@gambrelllaw.com    | mfmatheson@loomislaw.com          |

15. **Termination of Agreement**. Except as otherwise specifically set forth in this Agreement:

15.1 <u>Right of Termination</u>. This Agreement may be terminated at any time before the Closing Date as follows:

    A. By Purchaser and Sellers, together, in a written instrument;

    B. By Sellers if the Closing does not occur by July 1, 2014 as specified in section 16.1;

    C. By Purchaser or Sellers if there has been a material breach of any of the representations or warranties set forth in this Agreement on the part of the other Party, and such breach by its nature cannot be cured before the Closing; or

    D. By Purchaser or Sellers if there has been a breach of any of the covenants or agreements set forth in this Agreement on the part of the other Party, and this breach is not cured within ten (10) business days after the breaching Party or Parties receive written notice of the breach from the non-breaching Party.

15.2 <u>Effect of Termination: Election of Remedies</u>. If this Agreement is terminated:

    A. As provided in subparagraph 15.1A., this Agreement shall forthwith become void and have no effect, except for provisions of next succeeding sub-paragraph.



22

B. As provided in subparagraphs 15.1B.–D., upon Purchaser's breach Sellers' shall by written notice declare a forfeiture and retain the deposit as liquidated damages, and neither party shall have any further obligation to the other; upon Sellers breach, Purchaser, shall by written notice declare a forfeiture and shall have the right to have its deposit refunded in full.

15.3 <u>Exclusion</u>. Notwithstanding anything contained to the contrary in this Agreement, (1) the terms of any previously executed confidentiality agreement shall survive the Closing and (2) Seller will not, during the one-year period following the date of Closing, directly or indirectly solicit any employee of the Buyer to leave Buyer's employment. The Parties acknowledge that the current Chief Financial Officer ("CFO") of Sellers shall be under the employment of both Purchaser and Sellers as of the Closing Date. Purchaser and Sellers shall share equally the wages, cost of benefits and employment costs paid to or for the benefit of the CFO during the one year period following the Closing Date. Business expenses incurred by the CFO shall be paid by the party for whose benefit the expense was incurred. The CFO shall split his/her time equally between Purchaser and Sellers during the one year following the Closing Date. The wages and benefits are prorated and shall be paid equally by the Parties contemporaneously with each regular pay period. After the one year anniversary of the Closing Date, Purchaser and Labelle Management agree to negotiate in good faith any sharing arrangement of the CFO and a proration of wages and benefits moving forward.

## 16. Closing.

16.1 <u>Closing Date</u>. The Closing shall be held on or about May 1 but no later than July 1, 2014 (the "Closing Date") unless agreed to in writing by both parties.

16.2 <u>Closing Location</u>. The Closing shall be held on the Closing Date at 405 S. Mission, Mt. Pleasant, Michigan or at such other location as may be agreed upon by the Parties.

16.3 <u>Documents</u>. At the Closing and at any time after it, the Parties shall execute all documents necessary to put into effect the terms of this Agreement.

## 17. Miscellaneous.

17.1 <u>Amendment</u>. This Agreement shall not be amended, altered, or terminated except by a writing executed by each Party.

17.2 <u>Choice of Law</u>. This Agreement shall be governed in all respects by the laws of the State of Michigan.

17.3 <u>Headings</u>. The paragraph headings used in this Agreement are included solely for convenience.



23

17.4 <u>Entire Agreement</u>. This Agreement sets forth the entire understanding of the Parties; further, this Agreement shall supersede and/or replace any oral or written agreement(s) relating to this subject matter entered into by the Parties before the date of this Agreement.

17.5 <u>Waiver</u>. The waiver by any party of any breach or breaches of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of any provision of this Agreement.

17.6 <u>Binding Effect</u>. This Agreement, inclusive of its terms and provisions, shall survive the Closing and shall be binding on and inure to the benefit of, and be enforceable by, the respective heirs, legal representatives, successors, and assigns of the Parties.

17.7 <u>Construction of Agreement</u>. Each Party and its respective legal counsel has reviewed and revised this Agreement and has had equal opportunity for input into this Agreement. Neither Party nor their respective legal counsel shall be construed to be the drafter or primary drafter of this Agreement. In the event of any dispute regarding the construction of this Agreement or any of its provisions, ambiguities or questions of interpretation shall not be construed more in favor of one Party than the other; rather, questions of interpretation shall be construed equally as to each Party.

17.8 <u>Consent</u>. Unless otherwise provided, any required consent of a Party shall not be unreasonably withheld or delayed by such Party.

Purchaser and Sellers have executed this Agreement on the following dates to be effective as of the "Effective Date":

[INTENTIONALLY LEFT BLANK – SIGNATURE PAGE TO FOLLOW]

24

SELLERS:

Quick Casual Corporation, Fast Casual, LLC, Menu Concepts, Inc., MI Smash, LLC, and LLJBT Construction, LLC

Dated: April 9, 2014

By: Barton LaBelle
Their: President or Member

PURCHASER
Inspired Concepts, LLC

Dated: April 9, 2014

By: Jeffrey Neely
Its: Member

LaBelle Management:  Executed solely for purposes of Section 15.3 of this Agreement.

Dated: April 9, 2014

By: Barton LaBelle
Its: President

25

## List of Exhibits

| | |
|---|---|
| 1 | Trade Fixtures and Equipment |
| 1.1 | Bill of Sale for Assets |
| 1.2 | MLCC licenses, License Purchase Agreements and transfer application (to be prepared by Brad Hansen) |
| 2 | Assumed Liabilities |
| 3 | Restaurant Leases |
| 4 | ~~Management Agreements for Kalamazoo Bennigans, Howell and Gun Lake restaurants~~ |
| 5 | ~~Antlers Agreement (Attach Antlers management agreement or assignment of existing agreement - Sellers to provide)~~ |
| 6 | Office Lease – 405 S. Mission, Mt. Pleasant |
| 7 | LADCO, Inc. Option Agreement |
| 8 | Allocation of purchase price to various selling entities (attach the spreadsheet showing what portion of the purchase price is allocated to each selling entity – Brad Hansen or CPA to prepare) This will be attached at closing as different checks will need to be written to different entities of Seller. Purchaser should not be affected. |
| 9 | Inventories and Valuations of Inventory |

(Documents to be delivered on or prior to the Closing)

A      MUIA Forms 1027



EXHIBIT 1

Purchaser and Sellers agree that the assets being sold are all the assets currently being
used in the list of Restaurants being sold in Recitals Article A, to operate the restaurants
on a day to day basis but excluding inventory and depletable operating supplies.

Dated: April 9, 2014

By: Barton LaBelle
Its: Shareholder or Member
PURCHASER
Inspired Concepts, LLC

Dated: April 9, 2014

By: Jeffrey Neely
Its: Member

Dated: April 9, 2014

27

EXHIBIT 1.1

BILL OF SALE

GRANTORS: Quick Casual Corporation, Fast Casual, LLC, Menu Concepts, Inc., MI Smash, LLC, and , pursuant to a certain Purchase Agreement between Grantors, as Sellers, and Grantee, as Purchaser, dated: _____ and for and in consideration of the sums set forth herein, the receipt and adequacy of which is acknowledged in the form of cash payment has sold and grants to:

GRANTEE: Inspired Concepts, LLC

and to Grantee's successors, administrators, and assigns, all right, title, and interest in and to the following:

All of the tangible and intangible assets used in connection with operating the restaurants of Sellers listed in the Purchase Agreement including goodwill of the restaurants as going concerns and any assets so listed in the Purchase Agreement (the "Property").

Grantor, for Grantor's successors and assigns, covenants and agrees to and with Grantee individually and for Grantee's successors and assigns, to Warrant and Defend the sale of the Property against all persons.

Grantor further covenants, represents, and warrants the following:

1. Grantor has full right to sell and transfer the Property;

2. The Property is sold and transferred in good faith for actual and adequate consideration; and

3. There are no judgments, liens, mortgages, pledges, claims, rights, security interests, encumbrances, or any other adverse interests of any kind or nature against the Property.

Grantor has executed this Bill of Sale on *April 9, 2014*

_____
Witness

GRANTOR

_____
By: Barton LaBelle
Its: Shareholder and Member

28

STATE OF MICHIGAN )
_Isabella_ COUNTY )

On _April 9, 2014_, before me, a notary public, personally appeared
_Barton LaBelle_, to me known to be the person(s) who executed the foregoing
instrument, and acknowledge that such person(s) executed the same freely, and that the
consideration recited within the foregoing instrument was actual and adequate and was
given in good faith for the purposes set forth and not for the purpose of security or for
defrauding creditors of Grantor or subsequent purchasers.

_Steven Roger Howard_

Notary public, State of Michigan, County of _Isabella_
My commission expires  _10-13-19_
Acting in _Isabella_ County

Steven Roger Howard
Notary Public of Michigan
Isabella County
Expires 10/13/2019
Acting in the County of _Isabella_

29

## EXHIBIT 1.2

Attach Copies of exiting MLCC licenses; transfer applications including MLCC participation and management agreements.

30

EXHIBIT 2

The Assumed Liabilities include but are not limited to: any contracts used in the operation of the restaurants such as dishwasher leases, soda equipment leases, chemical leases, preventative maintenance contracts, yellow pages ads and other marketing contracts.

31



## EXHIBIT 3

Attach all Restaurant Leases to be executed at Closing.



32

## EXHIBIT 4

~~Attach Management Agreements for Kalamazoo and Howell Bennigans, Saginaw Ponderosa, and Gun Lake Restaurants to be executed at Closing.~~

20-02025-dob    Doc 1-1    Filed 04/09/20    Entered 04/09/20 21:12:34    Page 47 of 53

~~EXHIBIT 5~~

~~Antlers Agreement to be attached.~~ ρρη. 5/16/14

φ.η.

## EXHIBIT 6

Attach Office Lease for 405 S. Mission to be executed at Closing.

EXHIBIT 7

## OPTION AGREEMENT

Grantor, LADCO, Inc. a Michigan corporation, grants to Inspired Concepts, LLC, a Michigan limited liability company an exclusive Option to purchase certain contract rights according to the following terms and conditions:

1) LADCO has certain contract rights under a Master Franchise Agreement with franchisor Ponderosa.

2) LADCO grants to Inspired Concepts, LLC an exclusive option, starting on the date that is 5 years from the date of a certain Purchase Agreement between The Pixie, Inc, a Michigan corporation; Quick Casual Corporation, a Michigan corporation; Fast Casual, LLC a Michigan limited liability company; Menu Concepts, Inc., a Michigan corporation; MI Smash, LLC a Michigan limited liability company; and LLJBT Construction, LLC, a Michigan limited liability company as Sellers and Inspired Concepts, LLC as Purchaser, to purchase said contract rights under the Master Franchise Agreement noted above.

3) The Option shall be exercisable for 30 days following the date that is 5 years from the execution of the above referenced Purchase Agreement.

4) The price for the Option shall be five (5) times the annual fees collected by LADCO, Inc. under the Master Franchise Agreement.

5) If Inspired Concepts, LLC does not exercise the Option within the time frame noted at Article 3 above, the Option will lapse and,

6) LADCO will grant to Inspired Concepts, LLC an exclusive option starting on the date that is 7 years from the execution of the above referenced Purchase Agreement, this shall be know as to second option.

7) The Second Option shall be exercisable for 30 days following the date that is 7 years from the execution of the above referenced Purchase Agreement; if not exercised in said time frame, the Second Option shall lapse.

8) The Purchase price for the Second Option shall be six (6) times the annual fees collected by LADCO, Inc. under the Master Franchise Agreement.

9) This option shall inure to the benefit of and be binding on the parties to this Agreement and their heirs, legal representatives, successors, and assigns, and shall run with the land affected by this Agreement.



10) This Agreement shall become effective as of the date on which the last of the parties listed below signs this Agreement.

GRANTOR

LADCO, Inc.

Dated: April 9, 2014

By: Barton LaBelle
Its: Shareholder or Member

PURCHASER
Inspired Concepts, LLC

Dated: April 9, 2014

By: Jeffrey Neely
Its: Member

EXHIBIT 8

37

Allocation of Purchase Price to Various Selling Entities. Attach list, and amount for each, of to which entity checks should be written.

EXHIBIT 9

Attach non Alcohol Inventory Valuation, including food, paper goods, cleaning supplies
and operating supplies.
Attach Alcohol Inventory Valuation